PETER BROWN & ASSOCIATES PLLC
PETER BROWN
488 Madison Avenue, 18th Floor
New York, New York 10022
Telephone:    212.939.6440
Facsimile:    212.939.6417
*Attorneys for Plaintiffs*


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X

| | |
|---|---|
| PREECHA NUNTNARUMIT, <br> SUPHACHAI WATNASUVISUTH and <br> JACKRIT LOHAJAROENSUB <br><br> Plaintiffs, <br><br> -against- <br><br> LYCEUM PARTNERS LLC, JACOB <br> KATSMAN a/k/a YAKOV KATSMAN and <br> KRAMER LEVIN NAFTALIS & <br> FRANKEL L.L.P. <br><br> Defendants. | INDEX NO. <br><br> **COMPLAINT** |

------------------------------------------------------ X


    Plaintiffs Preecha Nuntnarumit ("Mr. Nuntnarumit"), Suphachai Watnasuvisuth ("Mr.

Watnasuvisuth") and Jackrit Lohajaroensub ("Mr. Lohajaroensub") by their attorneys Peter

Brown & Associates PLLC for their Complaint against defendants Lyceum Partners LLC

("Lyceum"), Jacob Katsman a/k/a Yakov Katsman ("Mr. Katsman") and Kramer Levin Naftalis

& Frankel L.L.P. ("Kramer Levin") (collectively, the "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of a plan to induce three citizens of Thailand to surrender the control of their valuable stock, worth almost $10 million in U.S. dollars, for the benefit of Defendants Lyceum and Mr. Katsman.  Through a series of premeditated, fraudulent and deceptive acts designed to extract the valuable stock from Plaintiffs' control, Defendants Lyceum and Mr. Katsman, and their agents, acted together to present misleading, inequitable and fraudulent contracts which were represented to be loan documents. In fact, the documents fraudulently gave full ownership of Plaintiff's stock to Lyceum, which promptly sold one hundred percent (100%) of the stock and concealed the proceeds. Only after Plaintiffs retained lawyers in Thailand, were Plaintiffs able to recover just thirty percent (30%) of the value of their stock even though they sought to rescind their agreements.  This action seeks to recover the full value of the Plaintiffs' stock, in addition to punitive damages arising from Defendants' scheme.

2.      Plaintiffs are all shareholders in E for L Aim Public Company Limited ("EforL"), a public corporation operating under the laws of Thailand.  In January 2016, Plaintiffs wanted to raise capital without disrupting their ownership interests in EforL. Plaintiffs were introduced to Cloud Capital Pte Ltd. (Singapore), ("Cloud Capital") which holds itself out to be an international financial advisory firm.  Plaintiffs were told by representatives of Cloud Capital that Lyceum would be willing to lend them up to sixty percent (60%) of the value of their EforL stock, which would result in loans totaling approximately $5.9 million.

3.      On January 21, 2016, the Plaintiffs met with a representative of Cloud Capital and were each presented with a series of identical "loan agreements" with Lyceum. Since the Plaintiffs did not understand English language documents, they were told by Lyceum's

representative that the 500 million shares of EforL they collectively owned would be collateral for their respective loans.  During this initial and only meeting the Plaintiffs all signed what they were told, and believed, were loan agreements.

4.       The Plaintiffs did not understand or know that the documents they were each signing were, in fact, fraudulent Master Repurchase Agreements ("MRA"), which were a form of sale and repurchase agreement (commonly known in the financial industry as a "Repo Agreement").  They did not know or understand that title to their EforL securities would be transferred to Lyceum, and that Mr. Katsman would gain complete control over these valuable securities.  They did not know or understand that the MRAs were drafted by Kramer Levin to remove virtually all protections typically provided to Plaintiffs as the "Sellers" under a Repo Agreement and included provisions which were coercive, and likely illegal.  As a result they were left at the complete mercy of Mr. Katsman as the Principal of Lyceum.

5.       Despite having signed the MRAs with Lyceum, the Plaintiffs were reluctant to transfer their valuable stock to a United States entity with no ties to Thailand.  To overcome Plaintiffs' continued resistance, they were each sent a document on Kramer Levin stationary attesting to the fact that $5.5 million was being held in the law firm's escrow account to fund the agreed-upon transaction.  Relying on the truth of the information in this document and the esteemed reputation of one of New York's premier law firms,  the Plaintiffs transferred their 500 million shares of EforL stock to Lyceum's local escrow agent, HSBC bank, on January 25, 2016.

6.       By the terms of the MRA, the Plaintiffs were to receive their "loan" proceeds of $5.9 million, minus certain unspecified deductions, on the fifth day after transferring their EforL stock to Lyceum.  Payment would be made contemporaneously with Plaintiffs delivering signed

Closing Statements, as identified in the MRA. That payment was not made as promised despite demands for payment in full and demands to unwind the transaction.

7.      Notwithstanding the prior representations of Lyceum and its agent, Lyceum did not hold the EforL stock as security.  In fact, during a period from January 25, 2016 to February 3, 2016, all of the EforL stock was sold. The sales were made despite the fact that there was no "Closing" of the transaction, as defined in the MRA.

8.      The proceeds of the stock sales were transferred by Lyceum three times within a matter of days from Citibank, to HSBC (Thailand) and, finally, to DZ Bank AG.

9.      On January 29, 2016, Plaintiffs did not receive the proceeds of the promised loan from Lyceum. Plaintiffs quickly realized that they had been deceived and swindled out of their 500 million shares of EforL stock.  Plaintiffs retained a Thai law firm (the "Thai Representatives") to recover their stock or the agreed loan payment.  The Thai Representatives first contacted Mr. Katsman to negotiate a resolution.

10.      When telephone negotiations with Mr. Katsman failed, the Thai Representatives traveled to New York City from Bangkok, Thailand to meet with Mr. Katsman at the offices of Kramer Levin on March 3, 2016.  Mr. Katsman never arrived for the scheduled meeting. Instead, the Thai Representatives met with a Kramer Levin partner, Christopher S. Auguste ("Mr. Auguste") who repeated Mr. Katsman's assertions that the promised $5.9 million had been reduced by a series of deductions and fees charged against the loan by Lyceum.  They were also told that Mr. Katsman was invoking a contract "penalty" due to Plaintiffs failure to timely close on the transaction.  The amount of the "penalty" was one per cent of the transaction amount for each day Plaintiffs failed to execute the Closing Statements purportedly required under the MRA.

11.     The Thai Representatives believed that their principals' entire investment would be lost if they did not sign the proposed settlement under the in such circumstances  presented by Kramer Levin.  After hours of negotiation, the Thai Representatives, in their best efforts to prevent their principals' further losses, believed they had to accept the sum of $3,525,581 on behalf of their principals to avoid greater damages.

12.     As a final demand from Mr. Auguste, the Thai Representatives were presented with purported releases to execute which purported to discharge Kramer Levin and Lyceum.

13.     Because Lyceum and Mr. Katsman have intentionally disposed of all the EforL stock and the proceeds of those sales have been hidden or spent, Plaintiffs are pursuing a number of alternative legal remedies in this litigation including (i) claims of tort arising from the transaction (fraud, aiding and abetting fraud, fraudulent inducement, negligent misrepresentation, conversion and breach of fiduciary duty); and (ii) claims relating to the MRA and related documents (breach of contract, rescission and unjust enrichment).

**THE PARTIES**

14.     Mr. Preecha Nuntnarumit is a citizen of Thailand, residing in Nonthaburi, Thailand.  Mr. Preecha also serves on the Board of Directors of EforL.  He was the owner of 200,000,000 shares of EforL stock at issue in this action.

15.     Mr. Suphachai Watnasuvisuth is a resident of Thailand, residing in Pathumthani, Thailand. Mr. Watnasuvisuth was the owner of 200,000,000 shares of EforL stock at issue in this action.

16.     Jackrit Lohajaroensub is a citizen of Thailand, residing in Bangkok, Thailand. Mr. Lohajaroensub was the owner of 100,000,000 shares of EforL stock at issue in this action.

17.    Lyceum Partners LLC is a New York limited liability company, formed, organized and existing under the laws of the State of New York in July 2013 with a business address at 575 Madison Avenue, 10th Floor, New York, New York.

18.    Jacob Katsman a/k/a Yakov Katsman is an individual who, upon information and belief, is a citizen of the State of New York and maintains a residence in Roslyn Heights, New York.

19.    Mr. Katsman is a founder and Chairman of the Board of GlobalTrade Corporation, a Canadian software company.  He is also the author of a book entitled "How to Make Money Without Money: The Art of Transferable Letters of Credit and Assignment of Proceeds."  He holds himself out as an expert in moving money through international banking procedures.

20.    At all times relevant to the allegations set forth in this complaint, Mr. Katsman exercised complete and actual dominion over Defendant Lyceum with respect to the transactions at issue in this action and such domination was used to commit the fraud or wrong that injured Plaintiffs.

21.    Kramer Levin Naftalis & Frankel L.L.P. is a law firm, which is, upon information and belief, a limited liability partnership, formed, organized and existing under the laws of the State of New York.  Kramer Levin maintains its principal office at 1177 Avenue of the Americas, New York, New York.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(2) because of the complete diversity between Plaintiffs, who are citizens of a foreign state, and Defendants,

who all reside in, or transact business in, New York State.  The matter in controversy exceeds the sum or value of $75,000, as to each Plaintiff, exclusive of interest and costs.

23.     Venue is properly laid in this district under 28 U.S.C. § 1391(a)(1), in that at least one Defendant resides in this district and all the Defendants reside in New York State.

24.     Venue is also properly laid in this district under 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

25.     The Plaintiffs each owned a substantial number of publicly traded shares in EforL.  EforL is a public company and its stock is traded on The Stock Exchange of Thailand (the "Thai Exchange"). It was started in 2005 as a company serving the advertising industry.  Its business now focuses on the sale and distribution of medical devices, laboratory devices, microscopes and health and cosmetic products.

26.     In 2015 the Plaintiffs each needed to raise capital.  They wanted to use the value of their substantial holdings of EforL stock without selling their interests or disrupting the public market value of their stock.

27.     Mr. Nuntnarumit had a special concern about selling any of his stock because he served on the Board of Directors of EforL.  He did not want to take any action which might impact these responsibilities or the value of the EforL stock.

Plaintiffs Meet With Lyceum's Agent from Cloud Capital

28.     On or about December 2015 or early January 2016, the Plaintiffs were introduced to Kanchuya Sukdheva who was a Managing Partner of Cloud Capital operating out of Singapore.

29.     Ms. Sukdheva stated that she could facilitate loans for Plaintiffs by using their EforL stock as security.  This would be accomplished because of her firm's relationship with Lyceum and Mr. Katsman.

30.     Ms. Sukdheva stated that Lyceum was a substantial and experienced financial firm with a corporate office on Madison Avenue in New York City.

31.     In truth and in fact, Lyceum is a paper entity under the control of Mr. Katsman, with no business and no employees.  The 10th floor "corporate offices" are shared space and mail services rented out to many different companies on a monthly basis.  Upon information and belief, Lyceum never had a physical office in this 10th floor suite and simply used this location as a mail drop.  Nevertheless, every document at issue in this action lists 575 Madison Avenue, 10th Floor as the business offices of Lyceum.

32.     Ms. Sukdheva stated that she was authorized by Lyceum to offer Plaintiffs sixty percent (60%) of the market value of their EforL stock in a secured loan transaction.  The loan would be for a term of three years.

33.     Ms. Sukdheva further stated that Lyceum would hold title to the EforL stock but "under New York Law" it could only sell up to ten percent (10%) of the shares held.

34.     On January 21, 2016 Ms. Sukdheva traveled to Bangkok and met with the three Plaintiffs at a local restaurant.  She stated that she was authorized to act as an agent on behalf of Lyceum.  Ms. Sukdheva brought with her three complete sets of English language legal documents, with each compilation totaling twenty-five pages. The Plaintiffs separately received a personalized set of the MRA and related documents.

35.    None of the Plaintiffs were fluent in English language legal terms or legal drafting.  They relied entirely upon the oral descriptions of the terms of the agreements made by Ms. Sukdheva.

36.    The main agreement, which each Plaintiff was urged to sign, was represented by Ms. Sukdheva to be a loan document in which the Plaintiffs' EforL stock was to be held as security.  This agreement was titled a Master Repurchase Agreement.

37.    Contrary to Ms. Sukdheva's representations, the MRA was a fraudulent sale and repurchase agreement, commonly known as a "Repo".  Repo agreements are typically used by institutional investors, including mutual funds and hedge funds, to meet institutional liquidity requirements.  Repo agreements are not commonly used in the United States for financing personal loans for a term of years.

38.    Plaintiffs were also told that they should feel confident in the proposed transaction because the Kramer Levin law firm would be acting as the escrow agent for the proposed transaction.  Kramer Levin was described as a prestigious and highly reputable law firm that was trusted by major corporate clients in large business transactions in the United States and internationally.

39.    After meeting with Ms. Sukdheva for less than one hour, all three Plaintiffs signed their respective copies of the MRA and related documents.  They delivered the signed copies to her for transmittal to Mr. Katsman at Lyceum.

40.    Plaintiffs did not know or understand that paragraph 7.3 of the MRA stated: "This Agreement and the other Transaction Documents are the result of negotiations between the parties and have been reviewed by counsel to Seller and Buyer, and are the products of both parties."  In truth and in fact, Plaintiffs were not given a chance to negotiate any term of the

MRA and there was no time, or opportunity, on January 21, 2016 for Plaintiffs to have the MRA reviewed by qualified counsel.

41.    In addition, on January 21, 2016 each of the Plaintiffs signed an agreement with Cloud Capital, acknowledging that it would be receiving a commission or fee of 2.75 percent (2.75%) of the proceeds from Lyceum for its role in the transaction.

42.    On January 22, 2016 Ms. Sukdheva, on behalf of Lyceum, sent the Plaintiffs a set of calculations, consistent with her representation that they would each receive sixty percent (60%) of the value of their holdings in EforL stock in the form of a loan.  Nevertheless, Plaintiffs had second thoughts about transferring title of their stock to Lyceum, an entity based in the United States.

      The Kramer Levin Memorandum Induces Plaintiffs to Act

43.    Ms. Sukdheva continued to urge the Plaintiffs to transfer the EforL stock.  To overcome their resistance, on January 23, 2016 Ms. Sukdheva sent Plaintiffs an electronic copy of a memorandum from Kramer Levin confirming that the sum of $5.5 million was being held in the law firm's escrow account, in anticipation of the pending transaction with Plaintiffs.  The memorandum stated:

> "Pursuant to Section 1.2 of the separate Escrow Agreements, each dated as of January 21, 2016, among Lyceum Partners LLC (the "Buyer"), Kramer Levin Naftalis & Frankel LLP (the "Escrow Agent") and each of you (each a "Seller"), the Escrow Agent hereby notifies Buyer and each Seller that $5,500,000 have been deposited into the Escrow Account."

44.    Upon information and belief, the lawyers at Kramer Levin knew, or should have known, that Lyceum had no operating capital, had no ability to fund and complete the transactions as promised and had no intention of completing the transaction and transferring the $5.5 million to the Plaintiffs.

45.     Plaintiffs' reluctance to transfer their stock holdings was overcome when they received the written representation that Kramer Levin was holding the money in escrow to fund the transactions with Plaintiffs.

46.     On January 25, 2016 Plaintiffs transferred 500 million shares of stock from their individual accounts to Lyceum's escrow account at HSBC Thailand.

### Lyceum Liquidates 100% of the EforL Stock

47.     Plaintiffs were not told, and did not know, that starting on January 25, 2016 and continuing to February 3, 2016, all 500 million shares of the EforL stock were transferred by Lyceum's escrow agent, HSBC (Thailand), to two local brokerage firms, which proceeded to unload all of the stock at any price on the Thai Exchange.  HSBC knew, or should have known, that its customer, Lyceum, was engaged in a fraudulent transaction and did not have title to the EforL stock when it was released from escrow.

48.     As a direct and proximate result of Lyceum's uncontrolled sale of 500 million shares of EforL stock, the market value of the stock dropped precipitously, causing a loss in the value of all EforL outstanding shares, which is estimated to be at least $45 million.  This is precisely the result sought to be avoided by the Plaintiffs in seeking a loan secured by their stock rather than selling it themselves in the Thai Exchange.

49.     As a direct and proximate result of Lyceum's sale of Plaintiffs' 500 million shares of EforL stock, the Plaintiffs were required to report to the securities industry regulators in Thailand that they had sold more than five percent (5%) of the outstanding shares of EforL stock in a short period of time.  Subsequently, this large sale was the subject of a public disclosure by these regulators.  This disclosure had a direct, negative impact on investor confidence in EforL

stock and the company's management. The value of Plaintiffs' remaining holdings of EforL stock were significantly diminished and their net worth was substantially decreased.

50.     As a direct and proximate result of Lyceum's sale of Plaintiffs' 500 million shares of EforL stock, Plaintiffs' reputations with the business community and banks of Thailand were severely damaged.  Plaintiffs' banks drastically decreased their available lines of credit and ability to borrow funds for their business and personal needs.  Their status as successful businessmen and community leaders were diminished and devastated.

51.     The proceeds of the foregoing stock sales by Lyceum were transferred three times within a matter of days from Citibank, to HSBC (Thailand) and, finally, to DZ Bank AG. Upon information and belief, the account within DZ Bank AG was in the name of a custodian, Raiffeisen Bank International AG. Upon information and belief, Citibank, HSBC (Thailand), DZ Bank AG and Raiffeisen Bank International AG either knew of the fraudulent activities of Lyceum or failed to adequately investigate Lyceum when it opened its accounts.  The pattern of transfers by Lyceum to three or four financial institutions had no practical purpose except to hide the funds, keep the funds outside the reach of the courts of Thailand or the United States and to frustrate any potential enforcement of the Plaintiffs' rights.

52.     Pursuant to paragraph 2.7 of the MRA, Lyceum was required to fund and close the transaction within five days after the Plaintiffs delivered their stock to the escrow agent, HSBC (Thailand), and also signed and delivered Closing Statements describing in detail the financial terms of the transaction.  However, Plaintiffs did not receive the proceeds of the transaction on January 29, 2016, as represented, although payment was duly demanded.

53.    Paragraph 1.1 of the MRA stated that the Closing Statement would be in the form of an attached exhibit and the "Closing Statement shall be delivered by Buyer [Lyceum] to Seller [Plaintiffs] contemporaneously with the funding of the purchase of the Purchased Securities."

54.    On January 28, 2016, Mr. Katsman sent an email to Ms. Sukdheva, Lyceum's agent, demanding that Plaintiffs make an additional payment in the range of $500,000 to $1 million because the market value of the "security" under the MRA (i.e., the EforL stock) had dropped in market value by more than twenty per cent (20%). This demand was made despite the fact that Lyceum had already sold the majority of the EforL stock even before a closing had occurred.

55.    Upon information and belief, the sole cause of the sharp drop in market value was that, over a few days, Lyceum had sold, and indeed dumped at any cost, EforL stock on the Thai Exchange.  In effect, Lyceum sought to be compensated for its own reckless and fraudulent actions.

56.    Concluding they had been deceived by Lyceum and Mr. Katsman, Plaintiffs contacted Ms. Sukdheva to object and seek to rescind the transaction. In turn she sent the following email demand to Mr. Katsman on February 1, 2016:

> "Dear Jacob, Please do not sell down EFORL shares going forward.  I have been repeatedly requesting you to seize [sic] [cease] the dumping of the share price since last Tuesday.  I would like to humbly implore again for you to stop the selling.  The clients would like to have their shares back and exit the transaction."

In addition, Mr. Nuntnarumit sent a written demand on February 3, 2016 requesting to unwind the transaction and to have his 200 million shares of EforL stock returned.  Mr. Katsman refused all these requests.

57.    Mr. Katsman also asserted that for each day Plaintiffs delayed executing the required Closing Statements under the MRA he would invoke paragraph 2.7 of the MRA, which

stated "Any delay by Seller [Plaintiffs] in completing the Closing will result in **penalties as determined by Buyer** [Lyceum] **in its sole discretion.**" (emphasis added)

58. In an email from Mr. Katsman dated February 9, 2016, Mr. Katsman stated that Lyceum was imposing a daily penalty of one percent (1%) per day of the original transaction amount to each Plaintiff, or a total of $52,040.76 per day.

59. Having failed to unwind the transaction, Plaintiffs retained Mr. Santi Piyatat and his associates as their representatives. The Thai Representatives promptly initiated negotiations on February 22, 2016 with Mr. Katsman to obtain payment in full on behalf of the Plaintiffs. The negotiation was unsuccessful.

60. Among other things, Mr. Katsman never acknowledged that the proceeds of Lyceum's sales of the EforL stock were hidden in European bank accounts and that moneys were unavailable to fund the loans. He demanded that the Plaintiffs sign a Closing Statement for a fraction of the originally promised $5.9 million. Mr. Katsman further stated that because of Plaintiff's delay and based on "his sole discretion," he was imposing a punitive daily penalty against the Plaintiffs, under paragraph 2.7 of the MRA.

The Meeting with Lawyers from Kramer Levin

61. Failing to reach any reasonable agreement with Mr. Katsman, Mr. Piyatat decided that only a face-to-face meeting with Mr. Katsman would result in a resolution. The Thai Representatives traveled from Bangkok, Thailand to New York City in furtherance of an agreed plan to meet with Mr. Katsman at the offices of Kramer Levin.

62. On March 3, 2016, the Thai Representatives came to the offices of Kramer Levin but Mr. Katsman never arrived from his home on Long Island, claiming to be ill. Instead, the

Thai Representatives met exclusively with Mr. Auguste who, upon information and belief, was the author of the MRA and related documents.

63.     Mr. Auguste aggressively urged the Thai Representatives to accept a settlement and sign the proposed Closing Statements. He never acknowledged the proceeds of the sales of EforL stock were hidden in European bank accounts. This settlement offered was a fraction of the promised payment under the MRA despite that fact that Mr. Auguste knew, or should have known, that Lyceum and Mr. Katsman were victimizing Plaintiffs due to their lack of experience with Repo Agreements and the Thai Representatives' unfamiliarity with the New York legal system as they related to the penalties in paragraph 2.7.

64.     Mr. Auguste repeated the threat that Plaintiffs were already being penalized under the MRA and that a penalty of $52,040.76 would continue for every day that they refused to agree to a settlement.  Mr. Auguste knew, or should have known that paragraph 2.7 of the MRA was oppressive, outrageous and likely illegal.

65.     After over ten hours of negotiations, the Thai Representatives were told that Lyceum would impose penalties totaling $1,319,897 (called "refunds" in the individual Closing Statements) on the Repo transaction.  The Thai Representatives feared that all of Plaintiffs' assets would be lost if the MRA "penalty" under paragraph 2.7 continued another four weeks. With time passing, and threatened by the oppressive MRA terms, the Thai Representatives executed one-sided release documents drafted by Kramer Levin which purported to release Lyceum, Mr. Katsman and Kramer Levin but left Plaintiffs fully liable to Lyceum.

66.     As a final demand, the Thai Representatives were presented with a revised form of Release Notice, which was substantially different from the Release Notice annexed to the MRA.  The Release Notice not only related to the release of the escrowed funds in the subject

transaction but also purported to grant a general release of Lyceum, Mr. Katsman and Kramer Levin from all liability.  However, Plaintiffs were not released from any of their obligations to Lyceum. This revised Release Notice was presented by the lawyers from Kramer Levin as a condition precedent to releasing the funds, although the MRA has no such requirement for any type of general release.

67.    On March 4, 2016 Mr. Auguste notified Mr. Piyatat that the sum of $3,525,580 had been transferred to Plaintiffs' bank in Thailand.

68.    On October 14, 2016 Mr. Katsman sent a written demand to each of the Plaintiffs claiming that the value of Lyceum's "security" (i.e., the EforL stock) had dropped in market value and, under the terms of the MRA, Lyceum must be compensated for this loss.  The total sum demanded from Plaintiffs was approximately $504,000.

69.    This demand was made despite the fact that the EforL stock had all been sold in late January and early February 2016 and Lyceum had not, and could not, suffer any loss based on changes in the market value of the EforL stock.

### FIRST CAUSE OF ACTION
### (FRAUD AS TO LYCEUM AND KATSMAN)

70.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 69 of this Complaint as if they were set forth at length herein.

71.    Lyceum either directly, or through its agent Ms. Sukdheva, knowingly made false statements to Plaintiffs to induce them to execute the MRAs, which caused them to lose title and control of their valuable 500 million shares of EforL stock.

72.    The substance of the statements, all of which were knowingly false when made, to (i) induce Plaintiffs to place their 500 million shares of EforL stock into escrow, and (ii) to

subsequently extract further payments from Plaintiffs included, but were not limited to, the following:

    a.  On January 21, 2016, during her meeting with Plaintiffs, Ms. Sukdheva identified the proposed transaction with Lyceum as a loan secured by the EforL stock and concealed that it was actually structured as a Repo Agreement.

    b.  On January 21, 2016, during her meeting with Plaintiffs, Ms. Sukdheva, stated that Lyceum would hold the EforL stock in escrow and that "by New York law" it was permitted to sell no more than ten percent (10%) of the total.

    c.  On January 21, 2016, the MRA, signed by Mr. Katsman, at paragraph 2.7, represented that Plaintiffs would be paid the full amount of their loan on the fifth business day after transferring their EforL stock to the escrow agent.

    d.  On January 21, 2016, the MRA, signed by Mr. Katsman, represented at paragraph 2.7 that any delay in closing would result in a penalty decided by Lyceum in "its sole discretion."

    e.  On January 22, 2016 by email and later confirmed by telephone, Ms. Sukdheva sent to each of the Plaintiffs a set of calculations representing that they would receive a loan in the amount of sixty percent (60%) of the market value of their holdings in EforL stock.

    f.  On January 23, 2016, Ms. Sukdheva, with the knowledge and assistance of Kramer Levin, sent Plaintiffs a memorandum via email, dated January 21, 2016 on the letterhead of the Kramer Levin law firm stating that it was holding $5.5 million dollars in escrow to fund the proposed loan transaction to Plaintiffs.

g.   On January 28, 2016, Mr. Katsman notified Ms. Sukdheva via email that he
demanded an additional payment from each of the Plaintiffs, pursuant to the
MRA, because the value of the "security" under the MRA (i.e., the EforL stock),
had dropped in market value creating a "Valuation Event" set out in the MRA.
Ms. Sukdheva subsequently forwarded Mr. Katsman's written demand to
Plaintiffs. The exact payment demanded was not specified but was placed in the
range of $500,000 to $1 million.  This demand was made despite the fact that
most of the EforL stock had been sold by Lyceum prior to January 28, 2016 and
by February it was holding no stock as "security" for the loan to Plaintiffs.
Further, the claimed drop in market value was caused directly by Lyceum's
reckless sale of Plaintiffs' EforL stock.

h.   On February 22, 2016, during a telephone conference call between Mr. Katsman
and Mr. Piyatat, Mr. Katsman asserted that Plaintiffs were not entitled to the full
$5.9 million promised under the MRA and, after the deduction of fictitious fees
and adjustments, Plaintiffs would receive only a fraction of the promised amount.

i.   On February 22, 2016, during a telephone conference call between Mr. Katsman
and Mr. Piyatat, Mr. Katsman demanded that the Plaintiffs sign the Closing
Statements.  Further, if they delayed, Mr. Katsman stated that based on his "sole
discretion," a penalty of one percent (1%) per day, for the total amount
outstanding under each MRA, would be imposed on each of the Plaintiffs.

j.   On February 22, 2016, during the same telephone conference, Mr. Katsman
intentionally concealed the fact that although the Closing Statement was not
signed and title to the EforL stock had not been transferred from Plaintiffs to

Lyceum per the terms of the MRA, he had nevertheless assumed control of the EforL stock and sold all of it on the Thai Exchange. Further, the proceeds were hidden in European bank accounts and not available to Lyceum.

k. On March 3, 2016, during the meeting between Mr. Auguste and the Thai Representatives at Kramer Levin's offices, Mr. Auguste repeated the assertion that Plaintiffs were not entitled to the full $5.9 million promised under the MRA, in substantial part because of the "penalty" asserted by Lyceum.

l. On March 3, 2016, during the meeting between Mr. Auguste and the Thai Representatives, Mr. Auguste stated that Lyceum would continue to impose the penalty of one percent (1%) per day as to each of the Plaintiffs until they agreed to a proposed "settlement," which was only a fraction of the value of the EforL stock transferred to Lyceum.

m. On March 3, 2016, during the meeting between Mr. Auguste and the Thai Representatives, Mr. Auguste intentionally concealed that despite the fact that no Closing Statements were delivered by Plaintiffs and no passing of title to Lyceum had occurred, Mr. Katsman had nevertheless sold all of Plaintiff's EforL stock and hidden the proceeds in European banks.

n. On March 3, 2016, during the meeting between Mr. Auguste and the Thai Representatives, Mr. Auguste stated that Lyceum would continue to impose the penalty of one percent (1%) per day on each of the Plaintiffs until and unless they agreed to sign a purported General Release with respect to the Kramer Levin law firm and a purported "Release Notice" which was effectively a general release of

Lyceum from all liability, including the underlying fraud perpetrated by Lyceum and Mr. Katsman.

o.  On October 14, 2016, Mr. Katsman demanded an additional payment via email to each of the Plaintiffs pursuant to the MRA because the value of the "security" under the MRA (i.e., the EforL stock) had dropped in market value below a "Valuation Event" standard in the MRA.  The payment demanded of Plaintiffs was approximately $504,000.  This demand was made despite the fact that all of the EforL stock had been sold by Lyceum in January and February 2016 and it was holding no stock as "security" for the loan to Plaintiffs.

73.    Lyceum, Mr. Katsman and Kramer Levin knew, or should have known, that all of the foregoing statements were false and they acted intentionally, dishonestly and with the intent to oppress.

74.    Citibank, HSBC (Thailand), DZ Bank AG and Raiffeisen Bank International AG knew, should have known, or intentionally failed to investigate, the business activities of Defendants.  As such they all actively assisted Defendants in the foregoing fraudulent activities and the concealment of the proceeds of the fraud.

75.    The Plaintiffs and their representatives reasonably relied upon Defendants' foregoing statements, assurances and intentional misrepresentations of New York law.

76.    As a proximate result of Defendants' conscious, willful, wanton, false and fraudulent statements and intentional misrepresentations, Plaintiffs have been damaged.

**SECOND CAUSE OF ACTION**
**(BREACH OF CONTRACT AND RECSISSON AGAINST LYCEUM)**

77.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 76 of this Complaint as if they were set forth at length herein.

20

78.    As set forth above, Plaintiffs executed the MRAs based on the fraudulent statements and material misrepresentations made by Defendants.

79.    By their terms, the formation of the MRAs as legally enforceable contracts were conditioned upon specified events of performance.

80.    Plaintiffs were informed and expected to receive loans totaling $5.9 million based on the then market value of their 500 million shares of EforL stock within five days of the delivery of their stock to Lyceum's agent in Thailand.

81.    Plaintiffs transferred their EforL stock to Lyceum's escrow agent on January 25, 2016. The MRA provided that the closing of the transaction would occur within five days of delivery of the EforL stock (Paragraph 2.7). Plaintiffs were required to sign Closing Statements, setting out the exact financial terms of the transaction.  Simultaneously with the delivery of the Closing Statements, Lyceum would fund the transaction and pay Plaintiffs the agreed loan. (Paragraph 1.1)

82.    No payment was made to Plaintiffs on January 29th or immediately thereafter although duly demanded.

83.    On February 1, 2016 Ms. Sukdheva (on behalf of Plaintiffs), and on February 3, 2016 Mr. Nuntnarumit, each sent a written demand to Mr. Katsman demanding to terminate the transaction and to have the EforL stock returned.  These requests were refused.

84.    On page 15 of the MRA, below the signature lines for Plaintiffs and Lyceum, the MRA states:

> IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT THE TRANSMITTAL OF THIS MASTER REPURCHASE AGREEMENT DOES NOT CONSTITUE AN OFFER BY THE PROPOSED BUYER [*Lyceum*] UNLESS ACTUALLY SIGNED BY BUYER.  MOREOVER, IT IS SPECIFICALLY AGREED THAT THE ENCLOSED [*the MRA*] DOES NOT

REPRESENT A BINDING AGREEMENT OR MEMORANDUM OF AGREEMENT **UNTIL EXECUTED AND PERFORMED** … (Emphasis added)

85.     Despite the explicit terms of the MRA, Lyceum failed to perform the MRA in the following material respects:

    a.   The MRA provides at Paragraph 2.7 that the Closing of the transaction and payment to Plaintiffs will be made on the fifth business day after Plaintiffs' EforL stock is delivered to Lyceum's escrow agent in Thailand, i.e., no later than January 29, 2016.

    b.   Lyceum failed and refused to pay anything to Plaintiffs on January 29, 2016. In fact, Lyceum made only a partial payment after Plaintiffs hired the Thai Representatives and those individuals met with Lyceum's counsel on March 3, 2016.

    c.   The MRA provided at Paragraph 2.1(a) that Lyceum would pay to Plaintiffs sixty percent (60%) of the market value of the EforL stock transferred to Lyceum's escrow agent.

    d.   Lyceum failed and refused to pay anything to Plaintiffs on January 29, 2016. In fact, the only payment made by Lyceum was for approximately thirty percent (30%) of the market value of the EforL stock.

86.     By reason of Lyceum's material delays and the substantial underpayments, it has failed to perform, as required by Paragraphs 2.1(a) and 2.7 of the MRA. Therefore, by the terms of the MRA, no legally binding contract was formed.

87.     Plaintiffs are prepared to return any partial performance in exchange for their valuable shares of EforL stock, if they are made whole.

88.     There is no adequate remedy at law for the recovery of the 500 million shares of EforL stock.

89.     By reason of the foregoing, Plaintiffs are entitled to rescission of the MRAs and return of their property.

90.     In the alternative, as a result of Lyceum's breach of the terms of the MRA, Plaintiffs have suffered damages.

## THIRD CAUSE OF ACTION
## (FRAUDULENT INDUCEMENT AGAINST KRAMER LEVIN)

91.     Plaintiffs repeat and reallege the allegations in paragraphs 1 to 90 of this Complaint as if they were set forth at length herein.

92.     Kramer Levin knowingly made misrepresentations and material omissions to induce Plaintiffs to transfer their 500 million shares of EforL stock into escrow for the benefit of its client, Lyceum.

93.     As the author of the MRA, Kramer Levin knew that the transaction with Plaintiffs was not a loan but was, in fact, a Repo Agreement in which title to the EforL stock passed to Lyceum. Further, the MRA was drafted by Kramer Levin to strip Plaintiffs of all rights and protections customarily included by the financial community in repo agreements.

94.     Kramer Levin knew that the rights given to Lyceum to impose a penalty on Plaintiffs under paragraph 2.7 of the MRA "in its sole discretion" was against the public policy of the State of New York and likely illegal.

95.     Kramer Levin knew, or should have known, that Lyceum would exploit Kramer Levin's reputation as one of the leading law firms in New York City and that Lyceum never intended to pay Plaintiffs the $5.5 million dollars previously represented to be the amounts due to Plaintiffs upon transfer of their EforL stock.

96.     The January 21, 2016 memorandum on the letterhead of the Kramer Levin law firm stated that it was holding $5.5 million dollars in escrow to fund the proposed loan transaction to Plaintiffs. As its author, Kramer Levin knew that this memorandum would be used to induce Plaintiffs to surrender their 500 million shares of EforL stock to the local Thai escrow agent.  Kramer Levin knew, or should have known, that the EforL stock would be sold immediately by Kramer Levin's client Lyceum, and Plaintiffs would never receive the promised $5.5 million.

97.     By reason of the foregoing fraudulent and material misrepresentations, Plaintiffs were induced to surrender their 500 million shares of EforL stock to the local Thai escrow agent, HSBC, as the first step under the procedures set forth in the MRA.

98.     During the March 3, 2016 meeting at the offices of Kramer Levin, the Thai Representatives, including Mr. Piyatat, were told by Mr. Auguste that Lyceum had the right to unilaterally impose a penalty of one percent (1%) per day on Plaintiffs unless they agreed to settle with Lyceum and execute two purported general releases.

99.     Mr. Auguste knew, or should have known, that this type of contractual penalty was likely unenforceable under New York law.

100.     The Plaintiffs and the Thai Representatives reasonably relied upon the statements, assurances and intentional misrepresentations of New York law made by Kramer Levin, an internationally recognized, prestigious and reputable law firm.

101.     By reason of the foregoing material misrepresentations regarding the alleged penalty, the Thai Representatives were induced to acquiesce to a highly unfavorable financial settlement and to execute documents which purported to release Lyceum and Kramer Levin but left Plaintiffs with full liability under their MRAs.

102.     As a proximate result of Kramer Levin's willful, false and fraudulent statements and intentional misrepresentations, Plaintiffs have been damaged.

## FOURTH CAUSE OF ACTION
## (AIDING AND ABETTING FRAUD AGAINST KRAMER LEVIN)

103.     Plaintiffs repeat and reallege the allegations in paragraphs 1 to 102 of this Complaint as if they were set forth at length herein.

104.     Upon information and belief, Kramer Levin knew, or should have known, that Lyceum was not engaged in any legitimate financial services or investment banking services and that the "offices" of Lyceum on Madison Avenue were nothing more than a mail drop and front for its fraudulent activities.

105.     Kramer Levin had actual knowledge of the fraudulent statements and activities of Lyceum and Mr. Katsman which resulted in significant financial losses to Plaintiffs.

106.     Kramer Levin knowingly provided substantial assistance to Lyceum and Mr. Katsman in carrying out their fraudulent scheme.

107.     In particular, Kramer Levin drafted one-sided documents which induced Plaintiffs to transfer their EforL stock, stripped Plaintiffs of their ownership rights, and contained a penalty term which was against New York public policy.  The firm drafted and negotiated "releases" which were based on false and misleading statements.

108.     Mr. Auguste participated in a negotiation with Plaintiffs' representative, Mr. Piyatat, and knowingly repeated false and misleading statements and intentionally deceived the Thai Representatives as to the legal claims being asserted.

109.     As a proximate result of Kramer Levin's willful and intentional actions, Plaintiffs have been damaged.

**FIFTH CAUSE OF ACTION**
**(BREACH OF FIDUCIARY DUTY AGAINST LYCEUM)**

110.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 109 of this

Complaint as if they were set forth at length herein.

111.    At all times at issue in this litigation, Lyceum had superior knowledge and

virtually absolute control of the disputed transaction which gave rise to the claims herein.

Lyceum knew Plaintiffs did not have proficiency in the English language, had limited knowledge

of U.S. laws and had no knowledge about how Repo Agreements were conducted.  In this

respect, they relied upon the judgment and good faith of Lyceum.

112.    Once Plaintiffs executed the MRAs and transferred their EforL stock to Lyceum's

local escrow agent, HSBC (Thailand), they could not protect themselves or avoid exploitation.

113.    By reason of the foregoing, a fiduciary relationship existed between Plaintiffs and

Lyceum.

114.    Lyceum breached its fiduciary duty to Plaintiffs by selling all of the EforL stock

in its custody within a week of the stock's transfer to Lyceum's local agent and prior to Lyceum

receiving signed Closing Statements to transfer title to the stock.

115.    Lyceum further breached its fiduciary duty on January 28, 2016 and again on

October 14, 2016 by demanding that Plaintiffs pay Lyceum additional monies citing paragraph

5.1(i) of the MRA which stated that a "Valuation Event" would occur if  the value of securities at

any time became less than eighty percent (80%) of Lyceum's purchase price.  These demands

were made despite the fact that Lyceum and Mr. Katsman knew that all of Plaintiffs' stock was

sold in January and February, 2016.

116.    As a proximate result of Defendants' conscious, willful, and intentional misrepresentations, Plaintiffs have been damaged.

## SIXTH CAUSE OF ACTION
## (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST KRAMER LEVIN)

117.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 116 of this Complaint as if they were set forth at length herein.

118.    At the time of the transfer of Plaintiffs' 500 million shares of EforL stock to Lyceum's escrow agent, HSBC (Thailand), Lyceum and Mr. Katsman had a fiduciary duty to Plaintiffs to act honestly and in compliance with the MRA.

119.    By the words and actions of Mr. Auguste at the March 3, 2016 meeting, Kramer Levin knowingly provided substantial assistance to Lyceum and Katsman in carrying out their breach of fiduciary duty.

120.    Kramer Levin provided such assistance with knowledge of Lyceum's and Mr. Katsman's duties to Plaintiffs and the knowledge that Lyceum's and Mr. Katsman's actions violated those fiduciary duties.

121.    As a result of Kramer Levin's aiding and abetting the actions of Lyceum and Mr. Katsman, Plaintiffs have been damaged.

## SEVENTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION AGAINST LYCEUM)

122.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 121 of this Complaint as if they were set forth at length herein.

123.    Lyceum's agent, Ms. Sukdheva, knew that Plaintiffs wanted a loan based on their holdings of EforL stock, had no knowledge of Repo Agreements, and had no knowledge of the legal language used in MRAs.

124.    Based on the representations made by Ms. Sukdheva, Plaintiffs believed that their EforL stock would be held as security for the loan and that Lyceum would hold and protect the Plaintiffs' stock.

125.    All of these representations were false.

126.    Plaintiffs justifiably relied on these representations because Ms. Sukdheva stated that she was an authorized agent of Lyceum; she had special expertise due to her position as the Managing Director of Cloud Capital; and she was authorized to present the MRA documents to Plaintiffs for their signature.

127.    A special relationship of trust and confidence existed between Plaintiffs and Lyceum because Plaintiffs believed the representation that Lyceum would hold the EforL stock as security for the loans for a period of three years.  Lyceum knew, or should have known, that Plaintiffs would rely on the statements made by Ms. Sukdheva and in the MRA.

128.    The representations by Ms. Sukdheva were intended to induce the Plaintiffs to rely upon them and to induce Plaintiffs to enter into the MRAs and transfer their valuable stock.

129.    The foregoing misrepresentations and omissions, in fact, deceived Plaintiffs, resulting in their executing the MRA documents and transferring their stock.

130.    As a result of these intentional and/or negligent misrepresentations, Plaintiffs have been damaged.

**EIGHTH CAUSE OF ACTION**
**(CONVERSION BY LYCEUM AND MR. KATSMAN)**

131.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 130 of this Complaint as if they were set forth at length herein.

132.    By the terms of the MRA the closing of the Repo transaction would occur on the fifth day following Plaintiffs' delivery of the EforL stock to Lyceum's escrow agent, HSBC

(Thailand).  On the closing date, Plaintiffs would deliver signed Closing Statements and, contemporaneously, Lyceum would fund the loan transaction. At that point title to the EforL stock would pass to Lyceum.

133.    Despite the fact that no closing occurred in late January or early February 2016, Lyceum nevertheless exercised control over the EforL stock and sold all of Plaintiffs' stock on the Thai Exchange.  Lyceum moved the proceeds through three international banks in a matter of days.

134.    At the March 3, 2016 meeting, the Thai Representatives were presented with a final demand to execute two forms of releases which purported to release all of Defendants' acts of fraud and conversion.  The first purported to release Lyceum and Mr. Katsman of all liability but released Plaintiffs of none of their obligations to Lyceum. The second purported to release Kramer Levin from their activities as Escrow Agent for the disputed transaction. These purported releases were presented by the lawyers from Kramer Levin as a condition precedent to release of the funds, although the MRA has no such requirement.

135.    By reason of the foregoing acts, Lyceum had no right or claim to Plaintiffs' EforL stock.

136.    Lyceum planned and executed the foregoing conversion with wanton dishonesty, malice and intent to oppress.

137.    The proceeds from the sale of the EforL stock were used for the benefit of Lyceum and Mr. Katsman, and for Kramer Levin's legal fees, which precluded Plaintiffs from exercising their rights of ownership over the EforL stock.

138.     Despite Plaintiffs' demand, they have not received the EforL stock and, upon information and belief, the proceeds of the sale are held by Lyceum or Mr. Katsman in foreign banks.

139.     As a result of the foregoing, Plaintiffs are entitled to return of their converted EforL stock, or just compensation in lieu of return of the stock.

## NINTH CAUSE OF ACTION
## (UNJUST ENRICHMENT AGAINST LYCEUM AND KATSMAN)

140.      Plaintiffs repeat and reallege the allegations in paragraphs 1 to 139 of this Complaint as if they were set forth at length herein.

141.     Plaintiffs placed their 500 million shares of EforL stock in the possession and control of Lyceum's escrow agent in contemplation of receiving a loan for $5.9 million.  The 500 million shares should have been released to Lyceum's control only after Plaintiffs executed Closing Statements agreeing to the final financial terms of the proposed transaction.

142.     The Closing Statements were signed on March 3, 2016 only after Mr. Auguste deceived and misled the Thai Representatives into signing these documents under the threat of an unenforceable "penalty" unilaterally imposed by Lyceum.  The Thai Representatives decided to sign only to prevent their principals' further losses.

143.     In truth and in fact, all of the EforL shares were accessed by Lyceum between January 25, 2016 and February 3, 2016, when all of the shares were liquidated on the Thai Exchange without Plaintiff's knowledge or consent and before Closing Statements were signed and title passed to Lyceum..

144.    Lyceum, under the direct control of Mr. Katsman, knowingly and unlawfully accessed and sold the shares for the benefit of Lyceum and Mr. Katsman, even though they knew Plaintiffs had not and would not consent to such sales.

145.    By reason of the foregoing, Lyceum and Mr. Katsman wrongfully obtained the benefit of the 500 million EforL shares held in escrow.

146.    At all times relevant herein, and continuing to the present, Plaintiffs had and continue to have a legal and equitable interest in the 500 million shares of EforL stock, which were improperly taken by Lyceum at Plaintiffs' expense and to their extreme detriment.

147.    As a result of Lyceum's and Mr. Katsman's wrongful conduct, they have been and continue to be unjustly enriched by the wrongful sale and liquidation of the 500 million shares of EforL stock.

148.    Lyceum and Katsman have failed to fairly and equitably pay or compensate Plaintiffs for their wrongful conduct, resulting in a substantial loss to Plaintiffs.

149.    As a proximate result of Lyceum's actions, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

a.    On the First Cause of Action, against Lyceum and Mr. Katsman, jointly and severally, compensatory, exemplary and punitive damages allowed by law in the exact amount to be proven at time of trial but not less than twenty million dollars ($20,000,000);

b.  On the Second Cause of Action against Lyceum, compensatory damages in the exact amount to be proven at the time of trial and/or restitution of the 500 million shares of EforL stock transferred to Lyceum;

c.  On the Third Cause of Action against Kramer Levin, compensatory, exemplary and punitive damages allowed by law in the exact amount to be proven at time of trial;

d.  On the Fourth Cause of Action against Lyceum, compensatory, exemplary and punitive damages allowed by law in the exact amount to be proven at time of trial but not less than twenty million dollars ($20,000,000);

e.  On the Fifth Cause of Action against Kramer Levin, compensatory damages, in the exact amount to be proven at the time of trial;

f.  On the Sixth Cause of Action against Kramer Levin, compensatory damages, in the exact amount to be proven at the time of trial;

g.  On the Seventh Cause of Action against Lyceum, compensatory, exemplary and punitive damages allowed by law in the exact amount to be proven at time of trial but not less than twenty million dollars ($20,000,000);

h.  On the Eighth Cause of Action against Lyceum and Katsman, compensatory damages in the exact amount to be proven at the time of trial; and,

i.  On the Ninth Cause of Action against Lyceum and Katsman, compensatory damages in the exact amount to be proven at the time of trial;

together with costs, reasonable attorneys' fees and such other and further relief as this Court

deems just and proper.


Dated:  New York, New York
         March 28, 2017

                                    Respectfully submitted,

                                    PETER BROWN & ASSOCIATES PLLC


                                    _____/s/Peter Brown_____

                                    Peter Brown
                                    pbrown@browntechlegal.com
                                    488 Madison Avenue, 18th floor
                                    New York, New York  10022
                                    Telephone  212.939.6440
                                    Facsimile:  212.939.6417

                                    *Attorneys for Plaintiffs*